**E-FILED**
Wednesday, 24 September, 2008 01:49:45 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION**

OSF Healthcare System, an )
Illinois not-for-profit corporation, )
d/b/a Saint Francis Medical Center, )
)
Plaintiff, )
)
v. ) No. 08-1096
)
Dr. Joseph J. Banno and )
Peoria Day Surgery Center, Ltd. )
)
Defendant. )

**REPORT AND RECOMMENDATION**

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This case is before the Court for a Report and Recommendation on Defendants' motion to dismiss Plaintiff's complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

**Standard**

To state a claim under federal notice pleading standards, all the Complaint must do is set forth a "short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Factual allegations are accepted as true and need only give "'fair notice of

what the . . . claim is and the grounds upon which it rests.'" EEOC v. Concentra Health Serv., Inc., 496 F.3d 773, 776-77 (7th Cir. 2007), *quoting* Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964 (2007)(other citation omitted). However, the plaintiff's "' . . . allegations, [must] show that it is plausible, rather than merely speculative, that he is entitled to relief.'" Tamayo v. Blagojevich, 526 F.3d 1074, 1083 (7th Cir. 2008)(quoted and other citations omitted).

"A complaint must do more than merely 'avoid foreclosing possible bases for relief. Tamayo, 526 F.3d at 1084 (quotation omitted). It 'must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level.'" Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing, 536 F.3d 663, 668 (7th Cir. 2008)(*quoting* Tamayo, 526 F.3d at 1084 and omitting quotation). "In a complex antitrust or RICO case a fuller set of factual allegations than found in the sample complaint in the civil rules' Appendix of Forms may be necessary to show that the plaintiff's claim is not 'largely groundless.'" Limestone Development Corp. v. Village of Lemont, Ill., 520 F.3d 797, 803 (7th Cir. 2008). "*Bell* . . . teaches that a defendant should not be forced to undergo costly discovery unless the complaint contains

enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case." Id. at 802-03.

Additionally, claims for fraud are subject to heightened pleading requirements under Fed. R. Civ. P. 9(b):

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

**Allegations**

The allegations are set forth as true for purposes of this Recommendation.

Defendant Dr. Banno is a urologist and is the president of Defendant Peoria Day Surgery Center, Ltd. ("Peoria Day"). Dr. Banno founded Peoria Day, which is "currently owned by approximately 40 surgeons . . . ." (Complaint ¶ 3). Since 2000, Physicians Advantage, Inc., a corporation owned by Bryan Zowin and Josh Bellamy, has managed Peoria Day's business operations. Peoria Urological Investment Partnership, of which Dr. Banno is a partner, owns land and building, which it leases to Peoria Day. (Complaint ¶ 5). Peoria Day's predecessor is Peoria Urological Associates, S.C., of which Dr. Banno was the president. "At all material times Dr. Banno has participated directly and extensively in the operation

and management of [Peoria Day], [Peoria Urological Associates] and Peoria Urological Investment Partnership."  (Complaint para. 6).

Peoria Day competes with Plaintiff for patients needing outpatient ambulatory surgery.  Caterpillar, Inc., is the largest payer for healthcare services in the Peoria area.

Seeking to reduce healthcare costs, in 1992 Caterpillar entered into a five-year exclusive agreement with Plaintiff, which provided that Plaintiff would be the "exclusive, fully-reimbursed provider of hospital services, including outpatient ambulatory surgery, for Caterpillar Members in the Peoria area."  (Complaint ¶ 12).[1]  Caterpillar members using other facilities were responsible for a co-pay of 30% of the allowed costs (increased to 50% in 2006).  In return for the expected high volume of patients, St. Francis deeply discounted its charges to Caterpillar.  The co-pay gave Caterpillar members a substantial financial incentive to choose Plaintiff's facility for their surgeries, thus ensuring sufficiently high patient volume to make the discounts financially feasible.  This exclusivity agreement was renewed in 1997 and 2001 with modifications discussed below to the extent relevant.

---

[1]Except for Pekin Hospital, an exception that is not relevant here.  (Complaint para. 12).

The 1992 agreement had two “carve-outs,” one of which is relevant here. The relevant carve-out was for Peoria Urological Associates, S.C., the predecessor to Peoria Day. The carve-out allowed for full reimbursement to Peoria Urological Associates for urological ambulatory services, but not for other services.

In 1996, Peoria Urological Associates, S.C., changed its name to Peoria Day Surgery Center, S.C..[2] However, that was not the end of Peoria Urological Associates, S.C.. A “‘new’” corporation was formed that same day, using the name Peoria Urological Associates, S.C.. (Complaint ¶ 19). “On information and belief, these actions were done to confuse the identities of the two corporations in an attempt to extend the Carve-Out for facility charges from [Peoria Urological Associates] to [Peoria Day]” Id. It is not clear, but apparently the new Peoria Urological Associates continued to provide urology ambulatory surgeries. (Complaint ¶ 4).[3]

Caterpillar repeatedly told Dr. Banno and Peoria Day that it would pay only 70% for non-urological procedures, that the co-pay could not be waived, and that Peoria Day “was obligated to bill and attempt to collect”

---

[2]Peoria Day Surgery Center, S.C., was later known as Peoria Day Surgery Center, Ltd.

[3]Peoria Urological Associates, S.C. is now known as Midwest Urological Group. (Complaint para. 4).

the co-pay.  (Complaint ¶ 24).  Dr. Banno and Peoria Day knew that Caterpillar members "were highly unlikely to use the facilities at [Peoria Day] if they were obligated to pay a 30 percent (later 50 percent) co-insurance payment, often amounting to several thousand dollars, . . . when they could have the same surgery performed by the same physician at [Plaintiff's]" with no co-pay.  (Complaint ¶ 25).

The "new" Peoria Urological Associates performed billing services for Peoria Day.  Under Dr. Banno's direction, Peoria Day submitted bills for non-urological procedures to Caterpillar under the name and tax identification number of Peoria Urological Associates, S.C..  "It is believed this was done to obscure the fact that [Peoria Day] was billing for facility charges for non-urological surgery . . . as if that surgery were urological . . . and, therefore, in-network," so that Caterpillar would fully reimburse the charges.  (Complaint ¶ 26).  "In furtherance of . . . [this] scheme to defraud, Dr. Banno and [Peoria Day] knowingly caused claims to be submitted . . . through the mail . . . to Caterpillar or to Caterpillar's third-party administrator, United Healthcare, . . . on a regular basis, and at least monthly, from about January 1, 1997, to about April 1, 2006.

The 2001 exclusive agreement between Plaintiff and Caterpillar provided that Caterpillar would remove the "carve-outs" if and when Caterpillar determined that Plaintiff had the capacity to handle more ambulatory surgeries. In 2002, St. Francis opened a new facility boasting ambulatory surgery suites. Consequently, in 2004 Caterpillar informed Peoria Day that the carve-out for urological procedures was being terminated. After August 1, 2004, *all* procedures performed at Peoria Day's facility for Caterpillar members were reimbursed at 70%, with a 30% non-waivable co-pay.

Dr. Banno "caused [Peoria Day] to expand its practice of waiving co-insurance payments from Caterpillar Member patients and correspondingly inflating the charges to Caterpillar to include facility charges for urological surgery done at [Peoria Day]." (Complaint ¶ 33).[4] "By means of this fraudulent scheme, Dr. Banno and [Peoria Day] were able to attract many

---

[4]The complaint does not specify how this waiver occurred. For example, it does not say whether the patients remained legally responsible for the co-pay but Peoria Day declined to enforce its rights, or, whether Peoria Day had a written contract with the patient before the surgery to collect only what it could from Caterpillar as payment in full. *Compare* Trustmark Life Ins. Co. v. University of Chicago Hospitals 207 F.3d 876, (7th Cir. 2000)(insurance contract not voided where patient signed agreement stating she would be responsible for any amounts not paid by insurer)(ERISA) *with* Kennedy v. Connecticut General Life Ins. Co., 924 F.2d 698 (7th Cir. 1991)(provider who was required to charge co-pay could not recover from insurer for services provided, where provider had contracted with patient to accept whatever insurer would pay as payment in full and thereby waived co-pay and inflated bill)(ERISA).

more Caterpillar Member patients . . . than they otherwise would have been able to do. Indeed, had . . .[they] engaged in accurate billing to Caterpillar, the number of Caterpillar Members having surgery performed at [Peoria Day] would have virtually evaporated." (Complaint ¶ 34).

In March 2006, through an audit and investigation, Caterpillar learned that Peoria Day was waiving the co-pay from Caterpillar members. Caterpillar consequently refused to pay any facility charges to Peoria Day as of April 1, 2006. A year later, however, Caterpillar entered into a preferred provider agreement with Peoria Day.

Defendants engaged in the same scheme with City of Peoria employees by waiving required co-pays and paying penalties owed by patients for using out-of-network facilities. When the City discovered the scheme, it informed Peoria Day that it would no longer pay for its services.

**Analysis**

Plaintiffs pursue three RICO counts. Count I comes under 18 U.S.C. § 1962(c), alleging that Dr. Banno, through his association with Peoria Day Surgery Center, an alleged "enterprise", participated in a pattern of racketeering activity (mail fraud and wire fraud) based on the alleged fraudulent billing. 18 U.S.C. § 1962(c). Count II, also under 18 U.S.C.

§1962(c), is against both Dr. Banno and Peoria Day Surgery Center, alleging that Dr. Banno and Peoria Day Surgery Center, while associated with "ASC Enterprise"[5], engaged in a pattern of racketeering activity (based on the same mail and wire fraud). Count III is under 18 U.S.C. § 1962(a) against Peoria Day for receiving income from a pattern of racketeering activity and investing it in the operation of ASC Enterprise.

Plaintiffs also pursue a state law claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1.

## I. Pleading RICO Fraud with Particularity

18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Racketeering activity encompasses mail and wire fraud, which, for relevant purposes, is communication through mail or wire to further a scheme to defraud. 18 U.S.C. § 1341; 18 U.S.C. § 1342. The communication does not need to

[5]The ASC Enterprise consists of Peoria Day Surgery Center, Peoria Urological Associates, Peoria Urological Investment Partnership and Physicians Advantage, Inc.. (Complaint para. 48).

contain false information within it, so long as it is "'incident to the essential part of the scheme'". Bridge v. Phoenix Bond & Indemnity Co., 128 S.Ct. 2131, 2138 (2008).

Defendants contend that the fraudulent scheme is not alleged with the particularity required by Fed. R. Civ. P. 9(b).

> Under Rule 9(b), a plaintiff must state with particularity "all averments of fraud or mistake." *Fed.R.Civ.P. 9(b); see also Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir.1997). The circumstances of fraud or mistake include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Gen. Elec. Capital,* 128 F.3d at 1078 *(quotation omitted); see also DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (describing Rule 9(b) particularity as "the who, what, when, where, and how: the first paragraph of any newspaper story").

Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing, 536 F.3d 663, 668 (7th Cir. 2008); Lachmund v. ADM Investor Services, Inc., 191 F.3d 777, 784 (7th Cir. 1999)(Rule 9(b) applies to civil RICO). However, "where a plaintiff is alleging fraud against a third party, less detail may be required under Rule 9(b) because the plaintiff may not have access to all the facts necessary to detail his claim." Uni*Quality, Inc. V. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992).

Defendants argue that Plaintiff must specify: 1) who received the billings (Caterpillar or United Healthcare, its third party administrator); 2) when the bills were sent with more specificity and whether sent by mail or wire; 3) whether all the bills were fraudulent; 4) what the bills said that made them fraudulent; 5) whether Caterpillar was misled or unaware of how it was being billed; 6) how Plaintiff learned of the audit and what the audit said in more detail; and, 7) the factual basis for Plaintiff's allegation that Dr. Banno directed the fraudulent billing.

Defendants do not explain how Plaintiff can be fairly be expected to have all this missing detail, given that Plaintiff did not receive the bills. Caterpillar/United Healthcare received the bills.  In fact, Plaintiff contends that "the documents or data which would provide the missing detail are exclusively within the possession of either the defendants, their related entities or Caterpillar."  (Plaintiff's Response, d/e 16, p. 5).  Plaintiff argues that documents garnered in a related and pending case in this district (*Peoria Day Surgery Center v. OSF Healthcare*, 06-1236) are subject to a protective order that prohibits disclosure of confidential documents in other litigation, and that the bills may be subject to the Health Insurance Portability and Accountability Act.  Id. at 6.  If the Court concludes more

particularity is required, Plaintiff asks for 90 days for discovery or to file information from case 06-1236 if that information is available.

The Court believes that Plaintiff has alleged sufficient detail of the fraudulent billing scheme with regard to the waived co-pays.  Over an identified period of time, Dr. Banno caused Peoria Day to surreptitiously waive the co-pay and send false bills to Caterpillar/United Healthcare pretending the co-pay had not been waived.  This scheme duped Caterpillar into paying more than it owed to Defendants (which arguably was nothing at all since Peoria Day had impermissibly waived the co-pay) and arguably increased Caterpillar's health care costs by removing the financial incentive for its members to use the lowest cost provider. Caterpillar ceased doing business with Peoria Day after discovering the ruse through an audit, raising an inference of detrimental reliance by Caterpillar on the fraudulent bills.  *See* Bridge v. Phoenix Bond & Indemnity Co., 128 S.Ct. 2131, 2143 (2008)(RICO plaintiff does not have to plead that he relied on misrepresentations to third party, though "it may well be that a RICO plaintiff . . must establish at least third-party reliance . . . .").  In the Court's opinion, these allegations sufficiently answer the "who, what, when, where and how" without relaxing Rule 9(b).  To the extent more detail is

required, the Court agrees with Plaintiff that Rule 9(b) should be relaxed because the bills and receipts are in the control of Defendants or non-parties. *Cf.* Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1328 (7th Cir. 1994)(plaintiffs had as much access as defendants to alleged fraudulent mailings); Ackerman v. Northwestern Mutual Life Ins. Co., 172 F.3d 467, 470 (7th Cir. 1999)(fraud claim dismissed under Rule 9(b) where plaintiffs' lawyers could have obtained information they needed by simply interviewing their clients and obtaining documents in clients' possession) (cases cited by Defendants). Defendants' argument that Dr. Banno's involvement in the scheme is speculation is one better suited to summary judgment after complete discovery.

The allegations about the bills sent by Peoria Day under the name and taxpayer identification number of Peoria Urological Associates is a harder question. Plaintiff believes this was done to "obscure" charges for non-urological services with the goal of obtaining full reimbursement for charges that only allowed partial reimbursement. However, the Court does not understand how the name and taxpayer identification furthered the fraudulent scheme. Plaintiff stops short of alleging that the bills actually falsely represented non-urological services as 100% compensable

urological services. The Court understands that the mailing need not contain the false information, but the Court does not understand how mailing a bill with a different name and i.d. number furthered the scheme to avoid the co-pay. *See, e.g.*, Uni*Quality, Inc., 974 F.2d at 923 (even under relaxed standard allegations essentially stated only that defendant never paid). Presumably if Plaintiff knows enough about the bills to know the name and taxpayer identification number on them, then Plaintiff should be able to plead with more particularity how those bills furthered the scheme. The Court accordingly will recommend that, to the extent the RICO fraud claim is based on bills with the wrong name and taxpayer identification number, that the claim be dismissed without prejudice to repleading.

**II. Proximate Cause of Plaintiff's Injuries**

Under RICO, 18 U.S.C. § 1964(c), "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue . . . and shall recover threefold the damages . . . and the cost of the suit, including a reasonable attorney's fee." "By reason of" means the § 1962 violation was the cause in fact of the injury *and* the proximate cause of the injury. RWB Services, LLC v. Hartford Computer Group, — F.3d —, 2008 WL 3892135 *3 (7th Cir. 2008)( "[P]laintiff must prove, . . .that the

'pattern of racketeering activity' both factually and proximately caused its 'injur[y.]'")(*quoting* Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992))(second bracket in original)).

Cause in fact means that Plaintiff's injury would not have occurred "'but for' the 'violation of section 1962.'" Id.  In other words, "[W]ould the claimed injury still have happened if the defendants had not engaged in the tortious conduct alleged?"  Id.  Defendants' arguments seem focused on proximate cause, rather than factual cause, so the Court will focus on proximate cause as well.  In any event, Plaintiff's allegations do plausible suggest that, but for the alleged waiver of co-payments, most if not all of the ambulatory surgeries performed at Peoria Day that were subject to the co-pay would have been performed at Plaintiff's.

As to proximate cause, "the central question . . . [the court] must ask is whether the alleged violation led directly to the plaintiff's injuries."  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006).  The Seventh Circuit recently explained that the "directness" requirement is "akin to saying that the victim was reasonably foreseeable, the traditional principle for hemming in tort liability."  RJB Services, 2008 WL 3892135 *5.  Proximate cause is the concept that "[a]t some point, even those who may claim a factual injury

are too far removed from the tortious act to be able to recover."  Id.

Proximate cause "is generally not amenable to bright line rules", Bridge v.

Phoenix Bond & Indemnity Company, 128 S.Ct. 2131, 2145 (2008), and

"requires careful consideration of the 'relation between the injury asserted

and the injurious conduct alleged.'" Anza, 547 U.S. at 462, *quoting* Holmes,

503 U.S. at 268.

      Two Supreme Court cases give concrete examples of when

proximate cause is *not* present in RICO actions.  In Holmes v. Securities

Investor Protection Corp., 503 U.S. 258 (1992), the Securities Investor

Protection Corporation sued a defendant under RICO for manipulating the

stock market.  The Corporation alleged that the stock manipulation had

caused brokers to go broke, which in turn had caused the brokers' inability

to pay their customers, which in turn had triggered the Corporation's duty to

reimburse the customers.  The Court found that the customers' harm was

not proximately caused by the stock manipulation–the two were "too

remote," "the customers' harm being purely contingent on the harm

suffered by the broker-dealers."  503 U.S. at 273.  The Court pointed out

the difficulty in calculating damages, which would require determining to

what extent the customers' injury was caused by the stock manipulation as

opposed to other possible causes.  The Court further pointed out that the brokers themselves "could be counted on to bring suit for the law's vindication."  Id.

In a more recent Supreme Court case, Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006), a business sued its competitor under RICO, alleging that the competitor had refused to charge its customers sales tax as required by state law, "allow[ing] it to reduce its prices without affecting its profit margin" in order to gain a competitive advantage.  547 U.S. at 454.  In furtherance of the scheme, the competitor had allegedly submitted false tax returns, thus defrauding the State of New York, and used the proceeds from that fraud to lower prices.  The alleged injury to the plaintiff from those artificially low prices was loss of business and market share.  Id.

The Supreme Court in Anza held that the injuries were not proximately caused by the sales tax fraud:

> The proper referent of the proximate-cause analysis is an alleged practice of conducting [the defendant's] business through a pattern of defrauding the State.  To be sure, [the plaintiff] asserts it suffered its owns harms when the [defendants] failed to charge customers for the applicable sales tax.  The cause of [the plaintiff's] asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State).

Anza, 547 U.S. at 458. Anza supported its conclusion by pointing out the difficulty in calculating the damages and the "speculative nature of the proceedings" that would ensue in an attempt to quantify how much of the price drop was caused by the racketeering activity and how much of the defendant's lost business was attributable to the price drop. 547 U.S. at 458. The Court also noted that "[t]he requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." Id. at 460.

In the Court's view, this case is different from Anza and Holmes. Here, Plaintiff was a foreseeable victim of and suffered a direct injury from Defendants' scheme to avoid the co-pay. *See* RWB Services, — F.3d —, 2008 WL 3892135 *5 (7th Cir. 2008)(direct and foreseeable victim can pursue RICO action even if other victims could also pursue actions). The scheme caused Plaintiff to lose the benefit of its bargain with Caterpillar, being increased patient volume. Plaintiff's injury is not derivative of the injury suffered by Caterpillar. Caterpillar's injury was paying too much for Peoria Day's services and the lost savings it might have realized if its

members had used Plaintiff's facility more.[6] That Caterpillar suffered injuries too does not make Plaintiff's injuries too remote for recovery.

Defendants argue that calculating damages is too speculative an endeavor because it is based on the false assumption that the co-pay would always cause Caterpillar members to choose Plaintiff over Peoria Day. Defendants posit that other reasons, besides costs, could drive a member's decision of where to have surgery, such as quality, the doctor's recommendation, location, and scheduling ease. (d/e 11, p. 12). Plaintiff counters that it is not speculative to conclude that few patients would choose to pay thousands more to have the same procedure performed by the same doctor at an out-of-network facility versus an in-network facility. Plaintiff also contends that any difficulty in proving damages with exacting precision is nothing unique in the legal system and not required by RICO or proximate cause.

The Court does recognize that calculating damages here will not be as straightforward as in Phoenix Bond, for example, where choosing between identical bids was based solely on the ratio of one entity's total bids to the total number of identical bids from other entities. 477 F.3d at

---

[6] The Complaint alleges that it is believed that the charges by Peoria Day and Peoria Urological Associates were higher than Plaintiff's discounted rates.

929-30; *compare with* James Cape & Sons Co. v. PCC Construction Co., 453 F.3d 396 (7th Cir. 2006)(bidder's alleged market share reduction and alleged loss of millions of dollars were not proximately caused by bid rigging)("A court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud.'").

However, in the Court's opinion, calculating damages here will not involve too many unknown variables, such as in Holmes or Anza. Defendants are correct that considerations other than cost might have driven patient decisions for surgery location, but that is a question that can be conceivable answered in discovery and would not entail speculation. The inquiry would involve a consideration of the circumstances of each fraudulent bill and procedure performed, perhaps a tedious and time-consuming task, but not necessarily an impossible one. Plaintiff may conceivably prove that the co-pay would have been, more likely than not, the deciding factor in an identifiable number of surgeries. As the Seventh Circuit put the question, "Does the presence of intermediate parties make it too hard to calculate damages-or create a risk that recovery by this plaintiff will come at the expense of someone with a better claim?" Phoenix Bond

& Indemnity Co. v. Bridge, 477 F.3d 928, 930 (7th Cir. 2007)(unsuccessful bidders at a county tax lien auction stated RICO claims against alleged bid riggers), *affirmed by* Bridge v. Phoenix Bond & Indemnity Co., 128 S.Ct. 2131 (2008). At this time, the answer is no in the Court's opinion.

**III. Enterprise/Association-In-Fact**

Count II is against Dr. Banno and Peoria Day, alleging that they, "while associated with the ASC Enterprise, conducted and participated, directly and indirectly, in the conduct of the ASC Enterprise's affairs through a pattern of racketeering activity" involving the same mail and wire fraud, fraudulent billing. (Complaint ¶ 49). The "ASC Enterprise" is defined as Peoria Day, Peoria Urological Associates, Peoria Urological Investment Partnership and Physicians Advantage, which have allegedly "associated together from at least the early 1990s (or, in the case of Physicians Advantage, Inc., since 2000) . . . for the purpose of constructing, maintaining, promoting, managing, and operating an ambulatory surgery center . . ." in Peoria. (Complaint para. 48).

Defendants argue that Plaintiffs have failed to allege that ASC is an enterprise under § 1962 because: 1) the entities (except for Physicians Advantage, Inc.) are part of the same "'corporate family'"; 2) no distinct

ongoing structure is alleged; and 3) Peoria Day cannot be named as part of the "enterprise," since it is a defendant in Count II.

As for the "corporate family" argument, Plaintiff does not dispute that separate parts of a "corporate family" do not form a RICO enterprise (for example, a parent corporation, its subsidiaries, agents, employees, or franchises). *See* Wooley v. Jackson Hewitt, Inc., 540 F.Supp.2d 964 (N.D. Ill. 2008). Plaintiff rather asserts that the ASC Enterprise is composed of distinct business entities, not parts of the same corporate family. The Court agrees with Plaintiff that the allegations characterize the parts of the enterprise as separate enough to avoid collapsing them together for purposes of the enterprise analysis.

However, the Court agrees with Defendants that Peoria Day cannot be part of the "enterprise." "An enterprise under RICO 'is the vehicle through which the "persons" execute the racketeering activity." Xinos v. Kappos, 270 F.Supp.2d 1027, 1031 (N.D. Ill. 2003)(quoted cite omitted). The "enterprise" must be "separate and distinct from the persons involved in the racketeering activities" because "[d]efendants cannot be liable for conducting their own affairs through a pattern of racketeering." Titan International, Inc., 189 F.Supp.2d 817, 824 (C.D. Ill. 2001); Chen v.

Mayflower Transit, Inc., 315 F.Supp.2d 886, 901 (N.D. Ill. 2004)("Liability under RICO depends on showing that two distinct entities exist: 'a "person;" and an "enterprise" that is not simply the same "person" referred to by a different name.")(citing Cedric Kushner Promotions Ltd., 553 U.S. 158 (2001)). In Count II, Peoria Day is the "person" (along with Dr. Banno) who allegedly used the "enterprise" to conduct a pattern of racketeering activity.[7] *See* 18 U.S.C. § 1961(c)("'person' includes any individual or entity capable of holding a legal or beneficial interest in property'").

The "enterprise," then, for Count II is Peoria Urological Associates, Peoria Urological Investment Partnership and Physicians Advantage. As an initial matter, the court does not see how Dr. Banno and Peoria Day participated in this enterprise to conduct racketeering activity. The allegations describe only how Dr. Banno used Peoria Day to further the scheme.

In any event, the Court agrees with Defendants that Plaintiff has not plausibly alleged an "enterprise" because the allegations paint no "hint of a structure" between the separate entities of the enterprise. Limestone

---

[7]The cases cited by Plaintiff are inapposite. *See* U.S. v. Masters, 924 F.2d 1362 (7th Cir. 1991)(enterprise not limited to individuals, could include groups of entities controlled by individuals); U.S. v. Lee Stoller Enterprises, Inc., 652 F.2d 1313 (7th Cir. 1981)(sheriff's office could be RICO enterprise).

Development Corp. v. Village of Lemont, Illinois, 520 F.3d 797, 804 (7th Cir. 2008). The investment partnership owns and leases the land and building to Peoria Day. Peoria Urological Associates provides (or provided, it is not clear) medical services, and Physicians Advantage is the business manager for Peoria Day. The Complaint alleges that these entities work together to construct, operate and promote an ambulatory surgery center, but working together is not enough. Limestone, 520 F.3d at 804 ("conspiracy is not a RICO enterprise unless it has some enterprise like structure, . . . "). *How* they work together (their "structure" for making decisions and taking action) is what is important for the enterprise analysis. Id. at 804-05 (even entities associated-in-fact must have some sort of structure to be an enterprise).

> [T]he Supreme Court has said that "enterprise" is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (emphasis added). Echoing this language, we said in *Richmond v. Nationwide Cassel L.P.*, *supra*, 52 F.3d at 644, that "enterprise" requires proof of "an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making."

Id.

Here, the Complaint names the entities and describes what they do, but there is no allegation of any kind of organized structure of how they work together, that "'the various associates function as a continuing unit.'" Id. at 805. The Court does not believe that the Complaint gives fair notice of how these three entities are structured as an "enterprise," formally or informally. The Court will therefore recommend that Count II be dismissed without prejudice to repleading.

**IV. Count III: Investment Injury**

Count III is against Peoria Day for "receiv[ing] income derived, directly and indirectly, from a pattern of racketeering activity and us[ing] and invest[ing], directly and indirectly , a part of such income, and the proceeds of such income, in the establishment and operation of the ASC Enterprise, which is engaged in, and the activities of which affect, interstate commerce, in violation of 18 U.S.C. Section 1962(a)." Count III is based on the same fraudulent scheme as the RICO counts under 18 U.S.C. § 1962(c).

18 U.S.C. Section 1962(a) provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in

> acquisition of any interest in, or the establishment or operation of, any enterprise . . .

Defendants ask that this Court, along with the majority of other courts to address the question, require allegations of injury caused by the investment of income in order to state a claim under Section 1962(a), rather than allowing the injury caused by the predicate racketeering acts to suffice.

It appears that all the circuits addressing the question directly, with the exception of the Fourth Circuit, have required injury from the violation of Section 1962(a) to state a claim under 1962(a). Only the Fourth Circuit has reached a different conclusion, holding instead that injury from the predicate acts is sufficient for a claim under Section 1962(a). Busby v. Crown Supply Inc., 896 F.2d 833, 837 (4th Cir. 1990); Super Vision Intern., Inc. v. Mega Intern. Commercial Bank Co., Ltd.,, 534 F.Supp.2d 1326, 1341 (S.D. Fla. 2008)(collecting circuit court cases).

The Seventh Circuit has expressly not decided the question:

> Although our circuit has not addressed the issue to date, the majority of circuits hold that the use or investment of racketeering income must proximately cause the plaintiff's injury; injury caused by the predicate racketeering acts is inadequate. . . . [citations omitted]. Moreover, the majority view is that the mere reinvestment of the racketeering proceeds into

> a business activity is not sufficient for section 1962(a) standing. . . . However, . . . we need not state definitively our view. . . .

Vicom v. Harbridge Merchant Services, Inc., 20 F.3d 771, 779 n. 6 (7th Cir. 1994)

District courts in the Northern District of Illinois have adopted the investment injury rule. *See cases cited in Vicom;* Cobbs v. Sheahan, 385 F.Supp.2d 731, 736 (N.D. Ill. 2005)("Following *Vicom*, district courts in the Seventh Circuit have applied the investment injury rule and have required the investment of income to cause a plaintiff's injuries.")(collecting cases). Plaintiff presses this Court to side with the minority view expressed by the Fourth Circuit.

The question need not necessarily be answered in this case, since, as discussed above, Plaintiff has not adequately alleged that the ASC Enterprise is a RICO enterprise. Further, the allegations do not explain how Peoria Day invested the racketeering income in the ASC Enterprise, even if it is a RICO enterprise. Accordingly, the Court does not believe Plaintiff has stated a claim, plausible on its face, that Peoria Day violated § 1962(a) regardless of the investment injury question.

In any event, the Court concludes, along with the majority, that an injury from the use or investment of the income must be alleged to make

out a claim under Section 1962(a).  The Court is not blindly jumping on the bandwagon.  The Court agrees with the reasoning behind that conclusion.  Primarily, 18 U.S.C. § 1964(c) allows "[a]ny person *injured* in his business or property *by reason of a violation of section 1962* of this chapter . . .[to] sue . . ."  A violation of Section 1962(a) is the investment of racketeering income in operating an enterprise.  Therefore, to sue under Section 1962(a) one must have been injured by reason of a violation of Section 1962(a).  Nugget Hydroelectric v. Pacific Gas and Electric Co, 981 F.2d 429, 437 (9th Cir. 1992); Ouaknine v. MacFarlane, 897 F.2d 75, 83 (2d Cir. 1990).

Plaintiff alternatively argues that injury is pleaded because the income was used to operate the ASC Enterprise, which in turn "further[ed] the ongoing conduct of fraudulently enticing Caterpillar patients away from [Plaintiff].  The operation of the ASC Enterprise, which included a separate urology group that was employed in extending the carve out to non-urologists, was separate from the predicate acts, which consisted of billing for services and receiving payment for those services."  (d/e 16, p. 20).  Yet these allegations do not explain how Peoria Day invested the racketeering income in ASC or how ASC's use of it injured Peoria Day.  In sum, the

allegations do not plausibly suggest that Plaintiff suffered an injury from

Peoria Day's investment of the racketeering income in the ASC Enterprise.

## V.  Supplemental Jurisdiction

Defendants advance that the state claim should be dismissed upon

dismissal of the RICO claims.  Given the Court's recommendation that the

RICO claim in Count I should remain, the Court recommends that

supplemental jurisdiction be retained over the state claim.

## VI.  Conclusion

WHEREFORE, the Court RECOMMENDS that Defendant's Motion to

Dismiss be GRANTED IN PART AND DENIED IN PART (d/e 10).  The

Court recommends that Counts II and III be dismissed without prejudice to

repleading for failure to state a claim.  The Court further recommends that

the RICO claims in Count I be dismissed only in part without prejudice to

repleading to the extent it is based on alleged invoices to Caterpillar with

the wrong name and taxpayer identification number.  The Court otherwise

recommends the motion to dismiss be denied.

Any objections to this Report and Recommendation must be filed in

writing with the Clerk of the Court within ten working days after service of a

copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1).

Failure to timely object will constitute a waiver of objections on appeal.

Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).

See also Local Rule 72.2.

ENTER: September 24, 2008

*s/ Byron G. Cudmore*

BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE